UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

                Plaintiff,

      -against-

THE CITY OF NEW YORK; NEW YORK
CITY POLICE DEPARTMENT ("NYPD")
OFFICER KATHERINE PAEZ; NYPD
OFFICER "JOHN" SWIFT (SHIELD # 10566)
NYPD OFFICER "JOHN" CASTILLO; NYPD
OFFICER "JOHN" STALIKAS; NYPD
SERGEANT "JOHN" COCA; AND NYPD
OFFICERS JOHN DOES #1-10,

                Defendants.

Index No. 18 Civ. 11414

**COMPLAINT
AND JURY DEMAND**

Plaintiff Jane Doe, by and through her attorneys, Emery Celli Brinckerhoff &

Abady LLP, for her Complaint alleges as follows:

**PRELIMINARY STATEMENT**

1.       On February 7, 2018, employees of the New York City Police Department

("NYPD") arrested Plaintiff Jane Doe when she was 40 weeks pregnant. Ms. Doe was arrested

for a misdemeanor related to a September 2017 family dispute with her ex-partner. There was no

urgent need to arrest Plaintiff that day by any stretch of the imagination. For the next thirty

hours—before, during, and after her labor and delivery of her baby daughter at Montefiore

Medical Center in the early morning of February 8th—the NYPD shackled Jane Doe using a

combination of metal handcuffs at her wrists and metal cuffs at her ankles.

2.       "Shackling" is the barbaric practice of using restraints on a pregnant

woman in custody during her transportation, labor, delivery, or recovery. Medical and

correctional experts are unanimous that shackling pregnant women is a dangerous, unnecessary, and humiliating procedure. It is a serious threat to the health of the mother and child.

3.     Shackling pregnant women is also unlawful. Between 2009 and 2015, New York State banned the use of *any* restraints on pregnant women absent the most extraordinary of circumstances.

4.     In this case, over the course of a thirty-hour period, the NYPD transported Ms. Doe – in restraints and visibly 40 weeks pregnant – all over the Bronx: from Bronx Family Court to the 47th Precinct; from the precinct to the hospital after Ms. Doe experienced Braxton-Hicks contractions; from the hospital back to the precinct; from the precinct to Central Booking; from Central Booking back to the precinct; and from the precinct back to the hospital.

5.     In the early morning hours of February 8, 2018, Ms. Doe went into labor in her cell and was taken from the police station to Montefiore Medical Center. At the hospital, the NYPD shackled her at the wrists and ankles. Against the vehement protests of medical staff, the NYPD refused to remove the shackles, compelling Ms. Doe to labor in excruciating pain and forcing doctors to examine Ms. Doe with her feet and hands bound. Ms. Doe was physically exhausted after a day and night in police custody. She struggled with her labor. Moments before Ms. Doe delivered her daughter, a growing chorus of outraged doctors convinced the NYPD to briefly remove her shackles. At 6:14 a.m., Jane Doe gave birth to her daughter. Shortly after she gave birth, NYPD officers again shackled her, ignoring the doctors' continued pleas. Ms. Doe struggled to feed her new baby with one arm.

6.     At many points before, during, and after her labor and delivery, Ms. Doe's doctors told the NYPD officers that their use of restraints posed a serious risk to Ms. Doe's and her baby's health, even appealing to an NYPD supervisor. Ms. Doe and her doctors asked the

NYPD take off the shackles. The NYPD's response? Shackling is the NYPD's "policy." The shackles stayed on until Ms. Doe was arraigned in her hospital bed, hours after giving birth.

7.      While she was in the NYPD's custody, Ms. Doe never struggled, resisted, or acted in any way that would even remotely support the use of restraints. Ms. Doe was terrified for herself and for her baby. She feared that she would deliver the baby alone in a cell at the 47th Precinct without medical help. She feared that after she gave birth, the NYPD would take her baby away. She desperately wanted her partner and her own doctor to be present for the birth, at her chosen hospital, consistent with her birth plan. But she remained compliant, urging herself to stay calm for the safety of her baby. These events are seared in Ms. Doe's memory; she experiences nightmares and relives the trauma over and over.

8.      This is a civil rights case about the egregious failure of the NYPD to protect the health, safety, and dignity of a woman at one of the most important and vulnerable moments in her life. Many NYPD personnel—officers and supervisors—encountered Ms. Doe that day and night. Every single one of them participated in, approved of, or failed to prevent the unconstitutional, illegal, and cruel shackling of Ms. Doe—even as she began to labor, gave birth, and care for her new baby with one arm handcuffed to her hospital bed.

9.      Ms. Doe seeks damages pursuant to 42 U.S.C. § 1983 for Defendants' violations of her rights under the United States Constitution and under New York law. She also seeks changes to the NYPD's policies to ensure that the NYPD will never shackle a pregnant woman in its custody again. Shackling is a dehumanizing, cruel, and pointless practice that has no place in New York City in 2018.

## THE PARTIES

10.      Plaintiff Jane Doe is a citizen of the United States and at all relevant times

was a resident of the Bronx, New York.

11. Defendant City of New York ("City") is a municipality organized and existing under the laws of the State of New York. At all relevant times, the City, acting through the New York City Police Department ("NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters, including the appointment, training, supervision, and conduct of all NYPD personnel. In addition, at all relevant times, the City was responsible for enforcing the rules of the NYPD and ensuring that NYPD personnel obey the laws of the United States and the State of New York.

12. Defendants Katherine Paez, "John" Swift, "John" Castillo, "John" Stalikas, "John" Coca, and John Does #1-10 (collectively, "Defendant Officers" or "Officers"), at all times relevant to this Complaint, were police officers employed by the City. In this role, Defendant Officers were duly appointed and acting officers, servants, employees and/or agents of the City of New York. At all relevant times, they were acting in the scope of their employment and under color of state law.

## JURISDICTION AND VENUE

13. This action arises under the Fourth and Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and New York state law.

14. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

15. The acts complained of occurred in the Southern District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

16. Plaintiff demands trial by jury.

4

# FACTUAL ALLEGATIONS

## A.    New York State Ends the Abhorrent Practice of Shackling Pregnant Women

17.    Medical experts, correctional experts, and maternal and fetal health experts unanimously agree that pregnant women should not be shackled absent the most extraordinary circumstances. Such extraordinary circumstances are limited to situations where a woman poses a risk of injury to herself or others that cannot be addressed by less restrictive means.

18.    Shackling poses a substantial risk of harm to a pregnant woman's health, and to the health and safety of the baby, at any stage of pregnancy.

19.    The American Medical Association, the Federal Bureau of Prisons, the U.S. Marshals Service, the American Correctional Association, the American College of Obstetricians and Gynecologists, and the American Public Health Association all oppose shackling pregnant women during labor, delivery and postpartum recovery.

20.    The American Medical Association issued a policy against shackling in 2010. The AMA found that shackling increased the potential for harm to the woman and baby, that "freedom from physical restraints is especially critical during labor, delivery, and postpartum recovery," and that "restraints on a pregnant woman can interfere with the medical staff's ability to appropriately assist in childbirth or to conduct sudden emergency procedures."[1]

21.    The American College of Obstetricians opined in 2011 that the use of restraints on pregnant women compromises health care, is demeaning, and is rarely necessary.[2]

---

[1] AM. MED. ASS'N, AN "ACT TO PROHIBIT THE SHACKLING OF PREGNANT PRISONERS" MODEL STATE LEGISLATION 1 (2010).

[2] AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, HEALTH CARE FOR PREGNANT AND POSTPARTUM INCARCERATED WOMEN AND ADOLESCENT FEMALES 3 (2011).

22.     Shackles interfere with healthcare providers' ability to conduct necessary tests to ensure the safe and healthy progression of a pregnancy.[3]

23.     Shackling can exacerbate a pregnant woman's already-compromised balance while she is standing or walking, increasing the risk of falls that can injure not only the mother, but also the fetus.[4]

24.     The use of shackles on a pregnant woman in labor can inhibit successful cervical dilation, unnecessarily prolonging her labor.[5]

25.     Women often need to move around during labor, delivery, and recovery to manage pain and avoid complications, including moving their legs as part of the birthing process. Shackling limits a woman's ability to shift positions to manage the extreme pains of labor and childbirth. This can, in turn, decrease the flow of oxygen to the fetus, endangering the health of both the mother and the unborn child.

26.     Shackling women during labor can lead to bruising from leg and abdomen restraints. Leg restraints can also cause severe cuts on women's ankles because of the strains associated with childbirth.[6]

27.     When restraints are used during labor, doctors are limited in how they can manipulate the mother's body for the safety of the unborn child.

28.     During the final stages of labor, it is particularly important for the

---

[3] Amanda Glenn, *Shackling Women During Labor: A Closer Look at the Inhumane Practice Still Occurring in Our Prisons*, 29 HASTINGS WOMEN'S L.J, 199, 202 (2018).

[4] ACLU Reproductive Freedom Project & ACLU National Prison Project, *ACLU Briefing Paper: The Shackling of Pregnant Women & Girls in U.S. Prisons, Jails & Youth Detention Centers* 3 (2012), https://www.aclu.org/files/assets/anti-shackling_briefing_paper_stand_alone.pdf (hereafter, "ACLU Briefing Paper").

[5] *See* Glenn, *supra*, n.3.

[6] *ACLU Briefing Paper* at 3.

physician to act quickly to avoid potentially life-threatening emergencies for both the mother and the unborn child. Shackles severely limit physicians' abilities to provide such emergency care, threatening maternal and fetal health.[7]

29.     Using restraints after delivery may prevent mothers from effectively healing and breast-feeding. It also puts new mothers at "substantial risk of thromboembolic disease and postpartum hemorrhage."[8]

30.     In addition to posing serious health risks to a mother and baby, shackling is almost never justified for security reasons.

31.     Among the states that have restricted the shackling of pregnant prisoners, none have documented instances of women in labor escaping or causing harm to themselves, the public, security guards, or medical staff.[9] Since New York City jails restricted the use of restraints on inmates admitted for delivery in 1990, there have been no reported incidents of escape or harm to medical staff.[10]

32.     In 2011, the United States Department of Justice convened a task force to address the use of restraints on pregnant women in custody. Its 2014 final report concluded that "[t]he use of restraints on pregnant women and girls under correctional custody should be limited to absolute necessity . . . when there is an imminent risk of escape or harm . . . . and these risks

---

[7] AMNESTY INT'L, ABUSE OF WOMEN IN CUSTODY: SEXUAL MISCONDUCT AND THE SHACKLING OF PREGNANT WOMEN 23 (2001).

[8] UNIV. OF CHICAGO L. SCH. – INT'L HUMAN RIGHTS CLINIC, THE SHACKLING OF INCARCERATED PREGNANT WOMEN: A HUMAN RIGHTS VIOLATION COMMITTED REGULARLY IN THE UNITED STATES 6 (2014), https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1008&context=ihrc.

[9] *ACLU Briefing Paper* at 5.

[10] *Id.*

cannot be managed by other reasonable means . . . ."[11]

33.     In 2008, the Federal Bureau of Prisons mandated that restraints not be used on women during labor, delivery, or post-delivery recuperation absent compelling circumstances.[12]

34.     Given the myriad complications that can result from the shackling of pregnant women, 22 states and the District of Columbia have adopted laws banning or severely limiting the use of any form of restraints on pregnant women.[13]

35.     New York was part of this movement; in 2009, the state legislature passed the Anti-Shackling Law, which banned the shackling of pregnant women during labor and childbirth. *See* N.Y. Corr. Law § 611 (2009).

36.     In 2015, the New York state legislature amended the Anti-Shackling Law to bar the use of any form of restraints on women during *any* stage of pregnancy, labor, or an eight-week post-partum recovery period. The statute permits "wrist restraints" shackling only in the most "extraordinary" circumstances for a pregnant woman, and it prohibits *all* restraints "when such woman is in labor, admitted to a hospital, institution or clinic for delivery, or recovering after giving birth." N.Y. Corr. Law § 611(1(a)-(b).

**B.     The City is Sued in 2016 For Shackling a Pregnant Woman**

37.     On July 25, 2015, NYPD officers in the Bronx arrested a woman who was 35 weeks pregnant at the time. NYPD officers transported her to the hospital when she

---

[11] Nat'l Task Force on the Use of Restraints with Pregnant Women under Correctional Custody, Best Practices in the Use of Restraints with Pregnant Women and Girls Under Correctional Custody 6 (2014); *see also* United States Marshal Service, Policy 9.1 (Restraining Devices), § (D)(3)(e),(h).

[12] Fed. Bureau of Prisons, *Escorted Trips* §570.45(9)

[13] Ginnette G. Ferszt, Michelle Palmer, & Christine McGrane, *Commentary: Where Does Your State Stand on Shackling of Pregnant Incarcerated Women?*, 22 Nursing for Women's Health J. 17, 18 (2018).

experienced a medical crisis, and then kept the woman in shackles for 72 hours while she was hospitalized.

38.     On September 28, 2016, the woman sued the City and several Bronx NYPD officers for violations of her constitutional rights. *See* Index No. 303220/16. The City settled her suit on May 30, 2017.

## C.     Defendants Arrest and Handcuff Plaintiff When She is 40 Weeks Pregnant

39.     Plaintiff Jane Doe is a twenty-seven-year-old woman. She was born, raised, and graduated from high school in the Bronx, where she still lives with her family. She identifies as African-American, Latina, and East Indian.

40.     On February 7, 2018, Ms. Doe was nine months pregnant, due to deliver her baby on February 9, 2018.

41.     In the months leading up to her due date, Ms. Doe had received prenatal care from her obstetrician at Bronx Lebanon Hospital. Ms. Doe planned to deliver her baby at that hospital under her obstetrician's care, with her partner at her side.

42.     On the morning of February 7, 2018, Ms. Doe appeared at Bronx County Family Court for a hearing at 9:00 a.m.

43.     After the hearing, Ms. Doe exited the courtroom and sat on a bench in the public corridor to wait for paperwork related to her appearance. Numerous other people were in the public corridor, including Ms. Doe's attorney.

44.     At approximately 9:50 a.m., Officer Katherine Paez and Officers John Does #1-5 appeared in the public corridor of the courthouse.

45.     Officer Paez and Officers John Doe #1-5 demanded that Ms. Doe stand up. Ms. Doe complied.

46.     In front of Ms. Doe's lawyer and all others present, Officer Paez informed

Ms. Doe that she was under arrest.

47.    At no point did Ms. Doe resist the Officers or refuse their commands in any way.

48.    Although Ms. Doe was visibly in a late stage of pregnancy, Officer Paez and Officers John Doe #1-5 placed her in handcuffs and escorted her out of the courthouse.

49.    Officer Paez and Officers John Doe #1-5 knew that Ms. Doe was pregnant at the time they handcuffed her.

50.    Officer Paez noted that Ms. Doe was nine months pregnant in her arrest log.

51.    Ms. Doe was taken in a police vehicle to the NYPD's 47th Precinct, still in handcuffs.

52.    At no time prior to her arrest did the NYPD contact Ms. Doe or her lawyer and ask that she surrender herself.

53.    When she was arrived at the 47th Precinct at approximately 10:40 a.m., Ms. Doe's handcuffs were removed and she was placed in a holding cell. At some point thereafter, the shift at the 47th Precinct changed.

**D.    Defendants Confine and Handcuff Ms. Doe For Many Hours, While She is Experiencing Contractions, and Disregard Warnings from Medical Personnel**

54.    On February 7, 2018 at approximately 7:40 p.m., Ms. Doe began to experience labor contractions. She sought medical assistance from the officers at the 47th Precinct. Officers "John" Swift and John Doe #6 were assigned to transport Ms. Doe to the hospital.

55.    At no point between 10:40 a.m. and 7:40 p.m. was Ms. Doe given or offered any food or water.

10

56.     Officers Swift and John Doe #6 placed Ms. Doe back in handcuffs and transported her to Montefiore Medical Center's Wakefield Campus, where they arrived at approximately 7:50 p.m.

57.     Officers Swift and John Doe #6 knew that Ms. Doe was pregnant at the time they handcuffed her.

58.     Officer Swift completed a Medical Treatment Form that evening, indicating in all capital letters that Ms. Doe was "NINE MONTHS PREGNANT."

59.     At Montefiore Medical Center, medical personnel told Officers Swift and John Doe #6 that the use of restraints on the very-pregnant Ms. Doe was dangerous to both Ms. Doe and her baby. Medical staff asked Officers Swift and John Doe #6 to remove Ms. Doe's handcuffs.

60.     Officers Swift and John Doe #6 refused to remove the handcuffs, citing an unspecified "policy" in the NYPD Patrol Guide and claiming they were following "procedure."

61.     Medical staff also noted with concern that Ms. Doe had not been given any food as of 9:10 p.m. Staff hurried to find her a cheese sandwich and some juice to ensure that her blood sugar levels did not drop after nearly 12 hours without anything to eat.

62.     Ms. Doe's contractions turned out to be Braxton-Hicks contractions, the contractions that occur before real labor. She was discharged from the hospital at 9:25 pm.

63.     Ms. Doe was taken, still in handcuffs, back to the 47th Precinct. Upon arrival, her handcuffs were removed, and she was placed back in a holding cell for several hours. Once again, during this period, the shift at the 47th Precinct changed.

**E.     Defendants Transport Ms. Doe to and from Central Booking in Handcuffs**

64.     Shortly after midnight on February 8, 2018, Officers John Doe #7-8

placed handcuffs on Ms. Doe and transported her to NYPD Central Booking in the Bronx.

65.     Officers John Doe #7-8 knew that Ms. Doe was pregnant.

66.     During the transport, other detainees in the van complained to Officers John Doe #7-8 that Ms. Doe's treatment was inappropriate, given her pregnancy.

67.     At Central Booking, NYPD staff informed Officers John Doe #7-8 that Ms. Doe could not be processed, given her pregnancy, stating in sum and substance that Central Booking medical staff did not know how to deliver a baby and that Ms. Doe did not belong there.

68.     Officers John Doe #7-8 brought Ms. Doe back to the 47th Precinct. During this entire period, Ms. Doe remained in handcuffs.

69.     Upon arrival at the 47th Precinct, Ms. Doe's handcuffs were removed, and she was placed back in her holding cell.

70.     During this entire period, the Officers did not provide Ms. Doe with any food or water.

**F.      Defendants Transport Ms. Doe Back to the Hospital and Shackle Her Throughout Her Labor, Against the Express Directions of Medical Personnel**

71.     A few hours later, at approximately 5:00 a.m., Ms. Doe went into labor and began experiencing strong contractions. She sought medical attention from the officers at the 47th Precinct.

72.     Officers John Doe #7-8 placed Ms. Doe in handcuffs and transported her to Montefiore Medical Center.

73.     Upon arrival at Montefiore Medical Center, Officers John Doe #7-8 procured a wheelchair to bring Ms. Doe from the vehicle into the emergency room.

74.     After placing Ms. Doe in the wheelchair, Officers John Doe #7-8 placed heavy shackles on her feet, binding her legs together at her ankles.

75.     Once again, medical staff at Montefiore Medical Center advised Officers John Doe #7-8 of the dangers of shackling and handcuffing a woman in labor. Ms. Doe's doctors told the officers that they were putting her life and the baby's life in jeopardy by continuing the use of restraints. Medical staff demanded that Officers John Doe #7-8 remove all restraints from Ms. Doe.

76.     Officers John Doe #7-8 refused, asserting that they were "following procedure."

77.     Officers John Doe #7-8 briefly removed Ms. Doe's shackles to allow her to change into a hospital gown, then immediately reapplied the shackles to both her hands and her ankles.

78.     As Ms. Doe continued to labor, a growing number of medical staff at Montefiore demanded that Officers John Doe #7-8 remove the restraints for the safety of Ms. Doe and her child.

79.     Officers John Doe #7-8 refused to remove the restraints until just a few minutes before Ms. Doe delivered her daughter at 6:14 a.m.

80.     Approximately ten minutes before Ms. Doe delivered her daughter, Officer John Doe #7 entered the birthing room, unshackled Ms. Doe's ankles, and partially uncuffed Ms. Doe's hands. He kept one of Ms. Doe's hands shackled to the hospital bed.

81.     During labor and delivery, Ms. Doe was physically exhausted and drained from the hours in police custody, in shackles, without adequate food or sleep. She struggled to summon her energy for the delivery.

82.     While delivering her baby, Ms. Doe heard doctors express concern that the baby was in some distress, which she feared was a result of her shackling.

83.     After delivering her child, Ms. Doe experienced heavy bleeding, and overheard the doctors express concern about it.

84.     Ms. Doe gave birth alone with strangers; she was denied the presence of her partner and obstetrician during her labor and delivery.

**G.     Ms. Doe is Shackled to Her Hospital Bed Immediately After Delivery**

85.     Shortly after Ms. Doe gave birth to her daughter, Officer "John" Castillo and Officer John Doe #9 placed shackles on her once again, chaining her feet together.

86.     Officers Castillo and John Doe #9 were aware that Ms. Doe had just given birth to her baby at the time they applied shackles to her feet.

87.     Ms. Doe was kept shackled to her bed even after her daughter was checked and returned to her, limiting her ability to hold and tend to her newborn child. She struggled to feed her daughter using just one arm.

88.     Medical professionals repeatedly asked Officers Castillo and John Doe #9 to remove the shackles, citing Ms. Doe's need to care for her baby, use the restroom, and otherwise manage her postpartum recovery, and the health risks to Ms. Doe. The officers insisted that Ms. Doe remain shackled while in bed.

89.     Medical records confirm that Ms. Doe was shackled post-partum, stating in a note at 11:43 a.m.: "Can ask NYPD officer for assistance with feet shackles for voiding oob [out of bed] to restroom but to be replaced while in bed according to officers."

90.     Officers John Doe #9-10 briefly unshackled Ms. Doe to allow her to feed her daughter at approximately 11:43 a.m., then promptly reshackled her to the bed.

91.     At approximately 11:57 a.m., medical professionals informed Officer "John" Stalikas that the shackling of pregnant women violates state law.

92.     Medical records reflect that Officer Stalikas responded that the NYPD Patrol Guide "requires all patients in custody to be cuffed or restrained in some manner" and *supersedes state law to the contrary*.

93.     Officer Stalikas then called the Sergeant on duty, Sergeant "John" Coca, to confirm that the NYPD Patrol Guide required Ms. Doe to be shackled.

94.     Sergeant Coca agreed that Ms. Doe had to be shackled, and he directed Officer Stalikas to continue the use of restraints on Ms. Doe.

95.     The handcuffs and shackles were not removed until approximately 3:00 p.m., when Ms. Doe was arraigned by video conference.

96.     When her criminal defense attorney arrived to represent her at the video arraignment, Ms. Doe learned that her arrest was for a misdemeanor criminal charge brought by an ex-partner, stemming from an argument between them at a store in September 2017.

97.     At every point in her contact with the Defendant Officers, Ms. Doe was cooperative, calm, and compliant.

98.     Between the time of her arrest and her arraignment, Ms. Doe never posed any risk of injury to herself or others, or any risk of flight or escape.

99.     Ms. Doe suffered physical pain, discomfort, trauma, and severe emotional distress as a result of this incident. She has nightmares about being shackled and losing her baby. She fears future encounters with police. She struggles with anxiety and panic about the incident.

100.    Within ninety days of the events described herein, Ms. Doe served a written notice of claim upon the City by personal delivery of notice, in duplicate, to the Comptroller's office at 1 Centre Street, New York, New York.

101.    A hearing on this notice was held pursuant to General Municipal Law §

50-h on October 16, 2018.

102. This action has been commenced within one year of Ms. Doe's shackling on February 7, 2018.

### **FIRST CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Deliberate Indifference to Serious Medical Needs/Substantive Due Process/Excessive Force
(Against All Defendant Officers)

103. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

104. At all relevant times, Defendant Officers were acting under color of state law in their individual and official capacities within the scope of their respective employments as police officers for the New York City Police Department.

105. At all relevant times, Plaintiff's late-stage pregnancy, labor, delivery, and post-partum recovery were serious medical needs.

106. At all relevant times, New York law expressly prohibited the use of any form of restraints on a pregnant woman in labor, in the hospital, or on a woman who has recently given birth.

107. At all relevant times, Plaintiff was either nine months pregnant, in labor, or had just given birth.

108. At all relevant times, there was no medical, legal, security, or other need to use restraints on Plaintiff.

109. At all relevant times, medical and correctional experts agreed that the use of shackles on a pregnant woman during transport, labor, delivery or recovery creates significant risk and danger to both the woman and the child.

110. By shackling Plaintiff, approving of such restraints, and/or failing to

intervene to prevent the use of such restraints over the course of her arrest and transport, Defendant Officers placed Plaintiff and her unborn and then-infant child at serious risk for potentially life-threatening complications and were deliberately indifferent to Plaintiff's serious medical needs.

111.    By shackling Plaintiff, approving of such restraints, and/or failing to intervene to prevent the use of such restraints over the course of her arrest and transport, Defendant Officers engaged in outrageous and conscience-shocking conduct.

112.    By shackling Plaintiff, approving of such restraints, and/or failing to intervene to prevent the use of such restraints over the course of her arrest and transport, Defendant Officers used excessive, brutal, sadistic and unconscionable force on Plaintiff.

113.    Defendants acted beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of her constitutional rights secured by 42 U.S.C. § 1983 including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments

114.    As a direct and proximate result of Defendant Officers' misconduct detailed above, Plaintiff sustained the damages hereinbefore alleged.

**SECOND CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Deliberate Indifference to Serious Medical Needs/Substantive Due Process/Excessive Force
(Against Defendant City)

115.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

116.    In the course of shackling Plaintiff, Defendant Officers cited to a "policy" or "procedure" which they were following. Defendant Officers told medical professionals that they were required to use restraints by this "policy" or "procedure."

117. Defendant City, through its policymakers within the NYPD, explicitly or tacitly approved the unconstitutional practice described above. In maintaining the "policy" or "procedure" regarding the use of restraints on pregnant women, the City was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

118. Defendant City was aware of and deliberately indifferent to the fact that its "policy" or "procedure" would result in the deprivation of Plaintiff's and others' constitutional rights. At all relevant times, Defendant City was aware that the use of shackles on pregnant women is proscribed by state statute.

119. Defendant Officers acted consistently with and pursuant to the "policy" or "procedure" when they engaged in the conduct set forth above.

120. Alternatively, Defendant City failed to adequately train Defendant Officers on the legal proscription against shackling pregnant women, women in labor, or women who have just given birth.

121. Defendant City's failure to train Defendant Officers directly caused Defendant Officers to shackle Ms. Doe and express the belief that the NYPD Patrol Guide supersedes state law.

122. Defendant City was deliberately indifferent to the need for such training, as evidenced in part by a prior lawsuit about Bronx police officers' unconstitutional shackling of a pregnant woman, and by the numerous Defendant Officers who believed the shackling of Ms. Doe was justified.

123. Defendant City, acting under color of state law, violated Plaintiff's rights under the Fourth and Fourteenth Amendment to the United States Constitution.

124. As a direct and proximate result of Defendant City's "policy" or

"procedure," or as a result of Defendant City's failure to train its officers, Plaintiff sustained the damages hereinbefore alleged.

### THIRD CAUSE OF ACTION
New York Correction Law § 611
Unlawful Use of Restraints
(Against All Defendants)

125.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

126.     At all relevant times, Defendant Officers knew that Plaintiff was pregnant, in labor, admitted to a hospital for delivery, within eight weeks of giving birth, or recovering after giving birth to her daughter.

127.     At all relevant times, Plaintiff was "confined" in an institution as described in the New York Correction Law § 611.

128.     At all relevant times, Defendant Officers used restraints on Plaintiff while she was transported to different locations, while she was in labor, while she was admitted to the hospital for delivery and while she was recovering from giving birth.

129.     At no point did Plaintiff pose any risk of flight or of any injury to anyone.

130.     Defendant Officers acted under pretense and color of state law. Defendant Officers acted beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of her statutory rights.

131.     As a direct and proximate result of Defendant Officers' misconduct and abuse detailed above, Plaintiff sustained the damages hereinbefore alleged.

### FOURTH CAUSE OF ACTION
Assault
(Against All Defendants)

132.     Plaintiff repeats and realleges the above paragraphs as if the same were

fully set forth at length herein.

133.     By reason of the foregoing, and by threateningly approaching Plaintiff and aiming to unlawfully apply restraints to her, Defendant Officers, acting in their capacity as an NYPD officers and within the scope of their employment as such, intentionally placed Plaintiff in apprehension of imminent offensive contact and displayed the ability to effectuate such contact, and thereby committed a willful, unlawful, unwarranted, and intentional assault upon Plaintiff.

134.     The assault committed by Defendant Officers was unnecessary and unwarranted in the performance of their duties as NYPD officers and constituted an unreasonable use of restraints.

135.     Defendant City, as employer of Defendant Officers, is responsible for Defendant Officers' wrongdoing under the doctrine of *respondeat superior*.

136.     As a direct and proximate result of Defendant Officers' misconduct and abuse detailed above, Plaintiff sustained the damages hereinbefore alleged.

### FIFTH CAUSE OF ACTION
Battery
(Against All Defendants)

137.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

138.     By reason of the foregoing, and by restraining Plaintiff's hands and legs, Defendant Officers, acting in their capacity as NYPD officers and within the scope of their employment as such, committed a willful, unlawful, unwarranted, and intentional battery upon Plaintiff.

139.     The battery committed by Defendant Officers was unnecessary and unwarranted in the performance of their duties as NYPD officers and constituted an

unreasonable use of restraints.

140.     Defendant City, as employer of Defendant Officers, is responsible for Defendant Officers' wrongdoing under the doctrine of *respondeat superior*.

141.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**SIXTH CAUSE OF ACTION**
Intentional Infliction of Emotional Distress
(Against All Defendants)

142.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

143.     Defendant Officers engaged in extreme and outrageous conduct in applying restraints to Plaintiff's arms and legs notwithstanding the fact of her pregnancy.

144.     In shackling Plaintiff, Defendant Officers ignored the clear risk of harm to Plaintiff and her daughter, and they ignored the express warnings of numerous medical professionals.

145.     Defendant Officers intended to cause Plaintiff severe emotional distress, or disregarded the substantial likelihood that their use of restraints would cause Plaintiff such distress.

146.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged, including but not limited to severe emotional distress.

147.     Defendant City, as employer of Defendant Officers, is responsible for Defendant Officers' wrongdoing under the doctrine of *respondeat superior*.

## SEVENTH CAUSE OF ACTION
New York City Human Rights Law
(Against All Defendants)

148.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

149.     Defendants engaged in unlawful discrimination against Plaintiff because of her gender in violation of N.Y.C. Admin. Code § 8-107(1).

150.     Defendants engaged in unlawful discrimination against Plaintiff because of her pregnancy in violation of N.Y.C. Admin. Code §§ 8-107(1) and 8-107(22).

151.     As a result of Defendants' discrimination against Plaintiff on the basis of her gender and pregnancy, Plaintiff is entitled to compensatory damages and to attorneys' fees and costs under N.Y.C. Admin. Code § 8-120(a).

152.     Defendants' actions in violation of the New York City Human Rights Law were intentional, with malice, and/or showed deliberate, willful, wanton, and reckless indifference to Plaintiff's civil rights, for which she is entitled to an award of punitive damages.

153.     Plaintiff has not filed any other civil or administrative action alleging an unlawful discriminatory practice with respect to the allegations of discrimination which are the subject of this Complaint.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

   a.  Compensatory damages against all Defendants in an amount to be determined at trial;

   b.  Punitive damages against Defendant Officers in an amount to be determined at trial;

c. A declaration that the NYPD's policy or custom of shackling pregnant arrestees during transportation, labor, delivery, or recovery violates the United States Constitution and New York State law;

d. Injunctive relief against the City of New York, including but not limited to ordering the NYPD to issue policies, training, and procedures prohibiting the shackling of pregnant women during transportation, labor, delivery and postpartum recuperation;

e. Reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and N.Y.C. Admin. Code § 8-120(a); and

f. Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       December 6, 2018

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By: _____/s/_____

Katherine Rosenfeld
Ashok Chandran

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff Jane Doe*